Department of Homeland Security, Office of General Counsel, Mr. Miano, before the appellant, Mr. Glover, before the appellant, Mr. Goldfarb, before the interviewer. May it please the court. I'm John Miano. With me is Christopher Hayek at the table. This court has repeatedly held that a party suffers an injury in fact when an agency action allows competition against it. My clients are in the technology industry, and the evidence here is overwhelming that the regulation at issue allows competition against them. Let me go through some of this evidence in chronological order. First, we have the rule itself that allows alien workers in H-4... Are you focusing on competition from HB-1 workers? You have several theories of standing. Is that the one you're focusing on here? Your Honor, I was going to start with the H-4. Is that because you think that's your stronger case? No, because I think it's the simplest one to explain. Well, why don't you test this? Why don't you start with your strongest case? Yeah, we might actually think the HB-1 is the stronger one. Right. Do you think the H-4B is stronger? It might be. Okay. Why don't you start with that? Okay, I'll start with the H-4B. My clients were all computer programmers at Southern California Edison who were all replaced by H-1B workers. So they are in competition with these workers who are overwhelmingly in the technology job market. This rule in question is designed to attract and retain H-1B workers in the job market. This rule repeatedly states it. I think it's about 20 times in the rule itself that it says its purpose is to attract and retain H-1B workers. There's a problem with relying on the purpose. We have held that, for instance, a statute of Congress which articulates a theory of injury doesn't affect the court's determination of whether there's injury in fact. Wouldn't that also be true of a regulation? It could well be, Your Honor, but here we know how the operation, the rule is. For example, we have the NICI who said that absent this rule, that their employees would leave. That is, of course, your strongest argument, isn't it? Not what the purpose of the regulation was, but the effect. The effect, Your Honor, because it's providing this incentive for you to remain in the job market and to attract more of these forward workers by allowing spouses. And is there any evidence of that? The evidence of that is in the record. You're referring to the comments? In the comments and the statement of purpose of the rule. I'll just explain to you, I'm not sure the purpose of the rule can give you standing. Right. The question is whether... Wait, do you agree with that? I agree that it's possible, yes, Your Honor. You agree with what? I agree that it is possible that just the absence of the statement of the rule by itself does not do it. But we have all the other factors going on here as well that's going, that's happening with each one. Excuse me, your strongest argument is the commenters, about 60 of them, right? I'll also give the other part, because there are two related injuries here, which is providing incentives to this. And this Court has repeatedly stated that providing incentives is an injury in fact. For example, Judge Tatel, National Biodiesel versus EPA, it was self-evident that the plaintiffs had an injury in fact, because the plan at issue incentivized competitors. Yes. But you have actual evidence of that from the commenters, right? We have that for the comment, and we also have that, again, from what purpose of the rule. And this is the effect. I mean, this is what the rule is saying it's doing. Otherwise, this rule has no purpose. And that's, I mean... It wouldn't be the first time. Right? I mean, it could well be. But, you know, why would they go through all this effort to do it if it didn't provide this incentive to retain workers? But I think Judge Silverman's point is that the question isn't what their purpose is, it's what the effect is. Right. I mean, they could have misgaged things, and it's your obligation to show us that there are people who are actually harmed by this. Harmed by this. But it's true. But I've said there are two interrelated theories here of standing. One is the actual increase in competition, which is the purpose of the rule. The second is the actual providing of benefits to the competitors to remain in the job market. What did you think of the government's argument that these HB1, H1B persons are already committed to staying in the country. So this doesn't add anything to it. That's I don't think that that I don't think that's real because of one said that we have this law because the way H1B program is that structure. Do we have this that we've created this long for people to get green cards, which now is decades, decades long. And many of the people are going to are going to eventually leave if they can't. And this spousal employment is supposed to keep them in the job market. So they so they would leave. Plus, another problem is that while there is a cap on the H1B visa, in general, there's a cap on the H1B visa, there's no cap on visas for academia. And so the number of H1B. No, no cap. I'm sorry. No cap on H1B visas to academia or research institutions. So there is a is a facility for attracting more workers. And the number of workers does vary by year on the H1B visa, even though it hits a cap. What I'm troubled with, it seems the commentators comments are all anecdotal. I was surprised that there was no statistical evidence that you that you offered showing a survey of the labor market and the likely effects of this. Well, remember, this is occurring before this complaint is filed before the rule goes into effect. You're seeking a preliminary injunction for the statistical numbers would have been would have been known. We're at a summary judgment stage, right? Right. Motion to dismiss. So, yeah, it would have been an opportunity for you to present that. Yes. I thought your point was that these comments were made before the rule went into effect. Right. Right. I think we're talking to rule comments. I don't understand why it should be relevant, whether it's summary judgment or motion to dismiss. This is a review of agency action, isn't it? Right. Sure. The district judge doesn't take any evidence. Right. The district judge essentially sits as an appellate judge reviewing agency action. So the rule is challenged, right? Right. Agency action. Yes. So I don't understand what the evidence you're talking about. I don't understand why summary judgment. We've written opinions explaining that when a district judge sits in review of agency action, the district judge is sitting as an appellate judge. He or she doesn't take evidence, except in extraordinary circumstances. Well, the only evidence presented is for standing in these cases. Yes, I can see. So the question of standing could be separately an evidentiary question. That's a fair point. And that's an interesting point. You're right. That would be different than the merits of the case. That's right. So would you like me to go from beyond H-1B in competition to H-4, or do you have any more questions? If you would like to, sure. Well, in the case of H-4, which I think is actually a simpler one to injury to explain, that this rule also allows the entry of aliens into the job market. And the evidence here, we of course. Would you describe? Why don't you say what the evidence is in the record? In the record. In H-4. Well, it starts with. Huh? Excuse me, Your Honor. I'm sorry for interrupting you. No, that's okay. I'm just asking you. You mentioned the evidence. So just tell us what is the actual evidence of competition from H-4 feasible? Yes, Your Honor. First of all, we have the rule. The rule allows. I know. But beyond the new rule. Beyond the new rule. Second, in chronological order, before the rule went into effect, the agency had a press conference in which it told the media that it expected that many of the workers in question would be of the type that normally get H-1B visas. All right. All right. Okay. Those were all overwhelmingly computer people. After the rule went into effect, within days, we have submitted job postings where employers were explicitly seeking workers on these H-4 visas. For computer jobs. Often to the exclusion of Americans. And you can go to any computer. This was directed directly towards the beneficiaries of the rule? Yes. Do you have a copy of one of those? Directed towards the spouses. Yes, Your Honor. Oh. Okay. I have appendix page 58. Would you like me to approach? No. Just read. Just read. Okay. Job opportunity for H-4 OPT candidates. I'm sorry, what? Job opportunity for H-4 OPT candidates. Who published this? This is from a – this was on DICE, the job board DICE. This is at page 58 in the appendix. Is this a company? Yes, Your Honor. What's the company? DICE is the largest technology job board on the Internet. Ah. So these are companies posting job boards, and they're saying here that if you're looking for a job, you're on this visa, on an H-4 visa, you can apply for the job. Excludes American workers. So technically this job posting is unlawful, but – But you don't have any evidence – there's no evidence in the record like there is for your H-1B case, where you actually have declarations from members of your organization that lost their jobs to H-1B visa holders, right? You don't have anything like that. No, they've not – Right? But – And the comments – and you don't have any comments in the record like you do for H-1B, correct? Correct, Your Honor. However, and the standard has always been that – are they allowed to compete? Okay? Compete in the market. So here is an example. We got the amici after the fact. Well, we don't know what the spouses are. You know, how – what do we know about the spouses? After – well, fortunately – They could be doctors. They could be – They could be, Your Honor. But – They could be judges. The Lord knows what they could be. But we knew that the agency expected most of these would be technology workers. And the amici, you know, after the fact here, brought two studies to the Court's attention that showed that the majority of these workers were in technology with the most common occupation being software developer. So this is after the fact. You'd admit, wouldn't you, that this is more speculative than your previous standing argument, right? You ask us to engage in some inferences here. And you kept going back to the purpose. And I thought we had decided that purpose can't get you there. You've got to show actual – I didn't think I was speaking purpose, Your Honor, here. Because this is the injury that's most firmly based in law. Because – But it's most speculative. You'll concede that your argument here is more speculative than the H-1B argument. No, I assure you, Your Honor. And the reason why I will disagree with you is because the standard is, are they allowed? And, yes, they are allowed. Now, I'll give you an example. One of my favorite cases is Judge Silverman's opinion in National Credit Union versus – First National Bank versus National Credit Union. I think we all agree with you. That's one of our favorite cases. That's one of my – I mean, I use this all the time. In that case, we have four North Carolina banks – They helped the Supreme Court affirm. Yes. Although that doesn't necessarily mean I was right. Well, in that case, we have an AT&T credit union, and they got administrative action that allowed them to enlist members outside of AT&T in a few other businesses, such as a local television station. And in that case, it was no dispute that there was an injury in fact, because they were allowed to compete. And the Supreme Court also echoed. There was no dispute that there was injury in fact, because they were allowed to compete. There's no discussion in your opinion, the Supreme Court opinion, on how do we know that these people at the television station are going to go to one of these three banks, or how do we know that these banks even have customers who are at the TV station. It was indisputable that there was an injury in fact, because they were allowed to compete. How did you get a television station? I thought it was involved in a credit union. Well, the AT&T credit union was the one that backed it, and they were allowed to enlist members at additional businesses. I see what you're saying. And the television station was one of a total of 16 businesses, and there were just four banks. And in that case... The competitors were banks. Right. Not the television station. Right. They were banks and the AT&T television station. And so we have no discussion of whether there can be or there actually was. And I also point out Judge Tatel's opinion in... Don't you have an opinion of Judge Griffiths? No, no, you might. Don't be discouraged. I want to hear about mine. In Judge Tatel's opinion, in American Institute of Certified Public Accountants versus the IRS... And I'm going to let you go over your time to finish this. ...that this Court has never required a showing of actual entry into a market to establish competitive injury. Okay. Your time is up. Thank you. We'll hear from the government. May it please the Court. I'm Matthew Glover, and I represent Apelli, the Department of Homeland Security. This Court should affirm the ruling of the District Court because SafeJobs has not shown that its members are in actual competition with H-4 visa holders who may get work authorization or... Let's assume you're right about that. Would you start with the H-1B visa holders? Yes. So the H-1B, the H-4, if I can sort of give a global view as to the... No, we got that. Why don't you just focus on H-1B? What I mean to say is the only H-1B visa holders who are receiving a benefit here are those whose spouses would get a work permit. Correct. And in order to be in that category, you must have applied for lawful permanent residence. You have to be married. Yeah, or have a dependent child, but... Yes, I know. Apologies, yes. Okay. You must have applied for lawful permanent residence, and to apply for lawful permanent residence, you would need to seek a green card, and the provisions that they seek a green card under are provisions in which the employer has to identify the job that they want to give you lawful permanent residence status for, and that job needs to be one which the employer certifies and the Department of Labor agrees no U.S. person is available for the job. Okay. This is explained in the district court's preliminary injunction opinion where she's discussing the two categories, employment-based preference two and employment-based preference three. So the H-1B workers who are receiving a benefit here are people who are in and going to stay in the United States to work permanently or get green card status, to work in a job for which the Department of Labor has determined no U.S. worker is available. They're not in competition with... What about the three affidavits from, that say affidavits from three SAVE members who say they lost their jobs to H-1B visa holders? So, Your Honor, this goes to the difference between all H-1B visa holders, not all of whom get a benefit from the H-4 rule. No, but they lost their jobs to H-1B visa holders. Understood, Your Honor. Doesn't that show that they're in competition, at least some of them? They may be in competition with those H-1B visa holders. But that's all they need to show. No, Your Honor, because not all H-1B visa holders are beneficiaries of the H-4 rule. You mean maybe the three in this case didn't have spouses? No, it doesn't require merely having a spouse. Your spouse doesn't have the ability under the H-4 rule to seek employment until you have begun the process for legal permanent residence or lawful permanent residence. My apologies for misspeaking there. And you don't begin the process for lawful permanent residence until your employer has identified the job for which they want to give you the green card. I'll use green card so I don't mix it up again. And when the employer identifies that, one of the initial steps, again, before you are applying as the H-1B holder, is that the employer shows to the Department of Labor and the Department of Labor certifies that there are no available U.S. jobs. You know, unfortunately, in this case, you're talking to a former Undersecretary of Labor. And I remember how those decisions are made. And I have to tell you, they aren't made exactly with the same deliberation that a decision in the Court of Appeals is made. In other words, when employers assert that, there's not a hell of a lot of investigation. And when an employer asserts that nobody is available in the domestic market, it's usually, I really want this fellow or a woman from who's a foreign. But there's no question there can be competition. I understand your argument. But that assumes the Labor Department is absolutely perfect in their judgment that there is no available person in the United States. So I would start with, I won't pretend to have a greater knowledge of the Department of Labor than your Honor, obviously, nor of labor law. But the presumption of regularity would be that the Labor Department, when it's agreeing and certifying, is making some degree of analysis. But even assuming that errors... But even assuming that's true. Anything that would keep that person there would be competition for Americans. Although your theory is, by definition, there's no American that can perform this job. Yes, that is our theory. That's your basic argument. There's no competition because no American can perform this job. Yes, well, because the lawful permanent resident, the job that is the basis for your green card application, the Department of Labor has made that agreement. But, your Honor... I still don't understand how that argument is consistent with the evidence in the record that three people actually lost their jobs to H-1B visa holders. So, your Honor, it gets to the... Those three people were employed, and now they're not, and their jobs are filled by H-1B visa holders. Your Honor, it gets to the distinction between all H-1B visa holders... But they don't have to show... All they have to do is show evidence of competition. They don't have to show that all of them are competing. What I'm trying to get at, and I apologize if I'm not being clear, is if a person gets an H-1B visa and they work a job, there's no requirement for the H-1B that you show that there's no available U.S. worker. So, in an example, a person's working in Job X. The employer replaces them, as the affidavit would say, with an H-1B holder. That H-1B holder doesn't... That person comes with a spouse on H-4. That H-4 visa holder does not have access to the H-4 rules employment opportunities unless that H-1B visa holder applies for a green card. And it's at that point, before they can apply for the green card... Yes, but they may go home if they... It takes a long time to get the green card. If your wife can't work or your husband can't work, there's a disincentive to stay in the United States even if you've applied for a green card. Understood, but prior to... So, therefore, you'll be a competitor. No, Your Honor, because prior to you applying for the green card, you, the H-1B visa holder, must be in a job for which the Department of Labor has said there's no available U.S. person. And I would just point to their affidavit discusses the past harm, but their affidavit doesn't say, and those H-1B workers at Southern California Edison were seeking lawful permanent residence. They don't identify a single one. They don't identify any people in that class of H-1B in the past who have sought lawful permanent residence and, therefore, would benefit from the H-4 rule. And so, insofar as Your Honor raised questions with me that maybe the Department of Labor is certifying and making some mistakes when they're certifying, there's nothing in the record showing a single instance of an H-1B visa holder who's seeking a green card, that the Department of Labor has agreed the job is one for which no American worker is available, that they've said, but I applied for that job and here's why I'm qualified. They provided no evidence. And so it's this subset of H-1B visa holders whose spouses would be able to work under the rule. Those are the only H-1B visa holders who get a benefit here. So arguing that they have to compete with H-1B visa holders doesn't mean the rule is actually affecting people they're competing with. They have put nothing in the record showing they're competing with that subset of H-1B visa holders. And I apologize if I'm not super – I'm trying to be clear about the process. I think footnotes 6 are. So a couple of points to that, Your Honor. First of all, Wash Tech was at the motion to dismiss, and we're at summary judgment here. And second, in Wash Tech, the court made clear that at the motion to dismiss, they were accepting Wash Tech's statements in their complaint that our employees work in STEM fields, our employees have applied for jobs with employers who currently have – at that time it was students who were working on what was called occupational practice training. So I've applied for a job with an employer that has occupational practice training students there, and some of those students are going to renew their occupational practice training under the 2016 rule and get additional time. Here, there's no affidavit saying, Company X has an H-1B visa holder who applied for lawful permanent residence and whose spouse will now be able to work, so it's an H-1B visa holder benefiting from the rule. And Company X told me, You can't have this job. We have someone else in this job. There's no evidence that they've applied for any of these jobs. They just provided nothing as to H-1B visa holders who benefit from the rule. Wash Tech, again, you know, now that we're at summary judgment, is putting in affidavits saying, I applied for a job at Company X. Company – I think Microsoft's one of the examples. There are a few others. And they have so many people who are in the OPT or students who are in this occupational practice training system. So I think the two distinctions are, first, it was a lower standard, and second, they did plead that they had employees who were seeking jobs at companies where students were receiving the benefit of the 2016 rule that was at issue here. They have not pled that they are seeking employment at companies for which H-1B workers who would receive a benefit from the H-4 rule are currently employed. But even if they did, their competition with those H-4 workers – excuse me – with the H-1B visa holders would require what Judge Silverman raised with me, the prospect that the H-1B visa holder was in a job for which no U.S. worker was available, but instead they were available. And I'd make one other point about market definition versus WASHTEC. WASHTEC purported to represent people across the STEM fields. There's a broad array of STEM fields. SAVEJOBS purports to represent former employers of Southern California Edison. Employees. Employees. Excuse me. Thank you, Your Honor. My assumption is Southern California Edison is operating in Southern California, but they've provided no evidence to sort of the range or geographic place that their employees – that their members are formerly employed or are looking for work. And they also haven't specified – you know, they talk about computer jobs, but there's a whole range of computer jobs from someone who programs software for apps on an iPhone to someone who works in, you know, tech support at the Department of Justice. And so they haven't shown any actual, you know, defined market for labor aside from computer jobs, and they haven't set a geographic limit on it. And as to the geographic limit, I would point to D.E.K. Power, which I think is cited in our brief at 18, where this court said that a Northern California natural gas supplier had not shown it was going to be injured by a FERC allowing a gas supplier from Canada to ship gas into Oregon because there was, you know, 700 miles and there was no explanation for how the gas was going to get there. We've seen no explanation for what the specifics – But that's not a competitive injury case, is it? That's not a competitive injury case. That's what this is. We in the Supreme Court have gone far in the competitive injury cases. I think Judge Chadle is telling you that. Understood. They did raise competitor injury standing there, I believe. But, again, I think I'll just close saying the competitor injury cases like Shirley, where you had the NIH competition, you know, the court emphasizes you're in clear competition in a defined market. I'm over time, Your Honor. I apologize. One question before you leave. Why in Lord's name is it taking the Department so long to revoke this rule, which they've proposed? Where is it sitting? Your Honor, and I apologize. I know we had two filings on this, and so it sounds like we didn't convey. It is sitting at OIRA in what I understand is called the pass-back process. And in the OIRA process, one of the things that the agency that seeks to have the NPRM, in this case GHS, can do is have shared stakeholder meetings. I think we described there's eight. I checked yesterday. I believe the most recent one was May 1st. And so there's both the OIRA review cost benefit and everything that's entailed in OIRA review and OIRA in addition with DHS engaging with stakeholders. Okay. Thank you. We'll hear from the intervener. May it please the Court, Carl Goldfarb on behalf of the interveners. I'd like to make three points, if I may. First, in response to Judge Tatel's questions about the affidavits. The affidavits talk about loss of jobs in 2014. That was before the rule was enacted. So to have standing, the plaintiffs have to show injury as a result of the rule. Obviously, 2014 loss of a job before the rule was enacted was not a result of the rule enacted in 2015. Point two, there's no evidence that there's going to be an increase in the number of H-1B workers. Oh, yeah. If someone lost their job to an H-1B visa holder, doesn't that show they're in competition with them? And in any event, true, pre-rule, but now the rule makes that competition even stronger. Why would we disregard that? Because, Your Honor, the question is whether there's going to be more H-1B workers as a result of the rule. If there's a – Well, but, no, the first question is, are they competing? Well – And the second question is, will the rule cause more? Well, and I'm not disputing that there's competition with H-1B workers, but to show injury, they have to show an increase in the number of H-1B workers because the rule is – Well, government counsel was essentially arguing there is no competition. Well – You don't agree with that, I take it? I want to make a separate point. Yes or no? You don't agree with that, right? That there – You think there is competition between H-B1 visa holders? I think it's a fair point that you need to look at. Wait, wait. Who's making a fair point, me or the government? I think the government made a fair point that you need to drill down a little bit into the H-1B worker and see if they're in competition. The case law says there has to be direct and current competition for there to be standing under this line of cases. And there isn't evidence that there's direct and current competition. But what I'm trying to say is there's also – you talked about – Judge Sullivan and others talked about commentators' statements. But those are predictions. Those are pre-the rule taking effect. It's not clear that there is going to be H-1B workers who are deterred from leaving the country. But they're in response – they're in direct response to comments which said this rule will not accomplish its purpose. But they're – And the department responded by saying false. Look at all these comments. But that's still not evidence, Your Honor. Those are predictions. They could have – they could have – They never have – there are case after case after case in which we've held there's standing the moment there's a competitor enters into the field. Right. Whether or not the competitor has an impact. Right. Well, Your Honor, for example, in – sorry. That's all right, Judge. You can answer Judge Sullivan's question, but then your time is up. Right. So this Court's case is that an actual and impending increase in competition suffices provided that this Court recognizes that that competition is almost certainly going to cause injury. And to show that it's almost certainly going to cause injury, you mean – No, no, no, no, no, no. I think if you – all we have to do is establish competition, and that alone constitutes injury. Right. Well, what I – We've never said – we've never said you have to be the petitioner or a plaintiff has to be driven into bankruptcy before there's standing? No. That's not. But in the – what I said was from Washtec 892F3 at 339, which is a case which is very similar to this one, and I'll read so I get exactly right. The plaintiff must show actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact. That's it. That's all you – all you have to do is show us an increase in competition. Then injury is assumed. That's all. You just read exactly my point. But it says almost certainly cause an injury in fact. And I think there has to be some analysis whether there's going to almost certainly be an injury in fact. I think you're misreading that. I think you're misreading it. I think we've concluded if there's competition, there's injury in fact. Well, in Washtec, as the government noted, there was evidence. There was evidence that the Washtec workers applied to Microsoft where the beneficiaries of the rule – You know, the problem is, as Judge Shadle keeps pointing out, you've got three people in this case who claim they lost their jobs. And there's now an incentive for the group of people who competed with them and caused them to lose their job, an incentive to these people to stay in the country longer. But as the government pointed out, one, it's not clear that they lost their job to folks who could be beneficiaries of the rule. And two, it's not clear that the rule, even if it's intended to increase the number of H-1B workers, will actually do so. There's no evidence in the record. The government did not attempt to predict in publishing the rule. It didn't say there's X number of H-1B workers who left the country because they got tired of waiting to get a green card. It didn't predict that what percentage of those workers – But they have evidence in the comments. There are comments who said that's exactly what happened. Well, the – There are people who said they left. But those are – it's not clear that those people are going to stay here. All right. We have your point. Thank you very much. Did counsel have any time left? You can take a minute, if you'd like it. Okay. I have a minute. This thing about the LPR, Lawful Permanent Resident Division. What do you say about his Labor – the government's Labor Department argument? That after all, these people have been certified, these people, the ones who are beneficiaries of the regulation, have been certified as indispensable and there's nobody that can compete with them because there's nobody in the American market as qualified to do the job. I have two parts to respond to that. First, as you noted, that things are kind of shady. You could go to – No, no, no. I didn't say they were shady. But you could go, for example, on YouTube and search for Cohen and Grigsby, where the law firm has a tutorial on how to not define American workers during that certification process. The second part, though, to that specific question is that we have this phenomenon of what we call body shopping in the industry. The largest use of H-1B workers is companies that supply bodies to other companies. So, for example, when the plaintiffs here were replaced by H-1B workers, Southern California Edison didn't hire them. They hired a company called Tata to bring them in. So Tata could go do this certification out somewhere else and then stick the bodies with another company. Ah, in other words, it's a labor contractor. Labor thing. And in regard to Wash Tech, the problem with – which I know well – Theoretically, when this contractor hires the H-1B worker and gets the certification from the labor department, the labor department has made the determination that there's no one in the American economy that can perform this job. So why does it matter whether it's a contractor or Southern California Edison? Okay, so they've determined there's no one at some specific point in time. Let's say they've got – in New York. Let's say the worker's in New York. He hires – they say there's no specific point in time. So now Southern California Edison or some other entity in competition, you know, direct competition with my clients, wants to bring in one of these workers. All the employer then needs to do is file a new labor condition application, which will automatically be – which the law requires will automatically be approved for Southern California Edison. And that New York worker now is in Southern California – Southern California Edison. Okay. Anything else? Okay, thank you. I would have said I did have quotes from Judge Griffith, but I just didn't get a chance. That's okay. He knows what his opinion said, and it's really a good opinion. Thank you. Case is submitted. Oh, we're going to take a brief recess so that the clerk can close the courtroom.
judges: Tatel, Griffith, Silberman